# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| PATRICK A. CICILIANO, | : | Case No. 3:16-cv-510 |
| | : | |
| Plaintiff, | : | Magistrate Judge Sharon L. Ovington |
| | : | (by consent of the parties) |
| vs. | : | |
| | : | |
| NANCY A. BERRYHILL, | : | |
| Commissioner Of The Social Security | : | |
| Administration, | : | |
| | : | |
| Defendant. | : | |

---

## DECISION AND ENTRY

---

## I.      Introduction

Plaintiff Patrick A. Ciciliano brings this case challenging the Social Security Administration's denial of his applications for Supplemental Security Income and Disability Insurance Benefits.  He applied for disability-based benefits under both programs in July 2011, asserting that he was under a disability starting on February 6, 2008.  His work limitations and alleged inability to work stem from his mental-health impairments.

An Administrative Law Judge (ALJ), Elizabeth A. Motta, concluded that Plaintiff was not under a disability.  She consequently denied his applications.  Plaintiff contends in the instant case that the ALJ Motta erred in rejecting the opinions of two examining psychologists, his treating psychiatrist, and two treating therapists (each of whom is a licensed clinical social worker).  He further argues that the ALJ erred by inadequately weighing the opinions of record-reviewing psychologist.

The Commissioner finds no error in the ALJ's decision and contends that substantial evidence supports the ALJ's findings.

## II.    Plaintiff and His Testimony

On the date Plaintiff's asserted disability began, he was under age 50 and was therefore considered a younger person under social security law.  20 C.F.R. § 404.1563(b).[1] He has a high-school education (GED) and worked over the years as a busser in a restaurant, a concession-stand worker, and an ice-cream-counter attendant.

Plaintiff testified at a hearing before ALJ Motta that he was under a disability due to obsessive-compulsive disorder, depression, and post-traumatic stress disorder.  He takes medication to treat but he still gets frustrated.  He explained, "Like at my last job, I was taking my medication and the boss was watching me real close, and I, I didn't like it the way he was watching me real close and I just finished my shift and never went back."  (Doc. #7, *PageID* #s 82-83).  When asked, what would keep him from doing any job, he similarly explained, "Just I get frustrated because I, I don't know.  I just get frustrated and I, I get mad if I think the boss is looking and me, and I want to leave or quit if I think the boss is watching me too closely."  *Id*. at 93-94.  Plaintiff explained that over the years he worked many jobs: some he quit; others he was terminated.  *Id*. at 94.

During a previous administrative hearing, Plaintiff reported that when he worked part time at a movie theatre, he would sometimes get upset and have trouble.  *Id*.  In his words, he would "get angry and fly off the handle."  *Id*.  at 111.  He quit that job "because the boss was watching me, and I didn't like the boss watching me, and it made me go crazy, and

---

[1] Citations social-security regulations are to those concerning Disability Insurance Benefits with full consideration of the corresponding regulations concerning Supplemental Security Income.

that's why I didn't go back." *Id*. He attempted to get that job back but he was never rehired.

Returning to ALJ Motta's hearing, Plaintiff indicated that he had been hospitalized for psychiatric problems on three occasions—in approximately July 2007, 2008 or 2009, and 2010. *Id*. at 83. The longest hospitalization lasted about 10 days. Plaintiff acknowledged that he has been diagnosed with pedophilia. He emphasized, however, that he never acted, and never would act, on feelings related to pedophilia. *Id*. at 90. On one occasion, he referred himself to the hospital because he thought he was going to act on those feelings. *Id*.

Plaintiff also had difficulty in the past with drug abuse but no longer used illicit drugs. He did not have problems with alcohol at the time of the ALJ's hearing in October 2015.

He has been diagnosed with depression, which causes him to get sad and not want to do anything. *Id*. at 91. He has crying spells about twice a month brought on by thinking about his father's death or about when he was molested as a child. A crying spell will last a couple of minutes. He has good days but depression causes him to have bad days about 2 or 3 times a week. During a bad day, he does not do anything. He doesn't want to shower, and he is lazy sometimes. He also doesn't want to properly care for his teeth. During bad days, he sits in his living room watching television.

Plaintiff has also been diagnosed with anxiety but does not have panic attacks. *Id*. at 92-93. He suffers from post-traumatic stress disorder due to a childhood rape. *Id*. at 82. He explained, "Sometimes I feel like, you know, just I feel sad and I feel why did this have to

happen to me being molested…. And I feel like why didn't I speak up when it happened and say something." *Id*. at 93. He sometimes has bad dream, although this occurs rarely or "[n]ot too much." *Id*.

Plaintiff's daily activities include chores such as taking out the trash and cleaning the bathroom. He sometimes mowed his friend's small yard. This did not stress him out because his friend "wasn't hanging over [him]." *Id*. at 85. He takes the bus sometimes and is able to shop. He does not socialize with his neighbors; he keeps to himself. He visits the casino about three times a month to play slot machines. He testified that he "get[s] free slot play. That's why I go." *Id*. at 86. He testified during the previous hearing that he played slot machines with money he would get from his aunt, stepmother, or roommate. *Id*. at 123. He told ALJ Motta that he likes to build model cars and airplanes but he had not done this in a long time—he had not completed one since 2003. He watches a lot of TV and does not read. He goes on the Internet, and he occasionally goes out to eat or to the movies with his roommate or another friend.

## III.    Medical Opinions

Psychologist Jeffrey Magnavito, Ph.D. administered the Millon clinical Multiaxial Inventory-III to Plaintiff while he was receiving inpatient treatment in June 2009. His subsequent report identified the following possible Axis II diagnoses: Negativistic (Passive-Aggressive) Personality Disorder, and Borderline Personality Disorder, with Sadistic Personality Traits, and Dependent Personality Traits. (Doc. #7, *PageID* #s 735-420). He suggested Axis I diagnoses of Generalized Anxiety Disorder, Alcohol Abuse, and Posttraumatic stress disorder. *Id.* He described Plaintiff as constantly vacillating, moody,

and critical, and noted that he often expects and elicits negative reactions from others; feels poorly treated by life; and may either withdraw irritably or act out in a problematic manner. *Id.* Dr. Magnavito hypothesized that Plaintiff may have problems associated with noncompliance or a disinclination to trust therapy. And Dr. Magnavito believed that realistic and firm, yet concerned, attention would probably motivate Plaintiff to follow short-term and focused treatment regimens. *Id.*

Dr. Magnavito identified several ways in which Plaintiff's impairments interfered with his relationships and daily functioning, including being untrusting, restless, erratic, unpredictable, and hostile. He reported that Plaintiff had a low tolerance for frustration. *Id.* Dr. Magnavito explained that, based on test data, it could be assumed Plaintiff was experiencing a severe mental disorder, and "further professional observation and inpatient care may be appropriate." *Id*. at 735. He opined that "although [Plaintiff] is usually able to function on a satisfactory basis, he may experience periods of marked emotional, cognitive, or behavioral dysfunction." *Id*. at 737.

Psychologist Sarah Hodgson, Ph.D. evaluated Plaintiff in December 2011. She opined that, if Plaintiff was found eligible through the state agency, he "would … be a strong candidate for job coaching and assistance in finding and maintaining supported employment. If he is not able to maintain gainful employment due to mental health symptoms, Social Security Disability Insurance may be an alternative option for his support." *Id*. at 745.

Plaintiff's roommate, Stephen Bickford, told Dr. Hodgson that Plaintiff had been homeless when he (Bickford) took him in. Bickford guessed that Plaintiff might have an

intellectual disability or autism spectrum disorder. *Id.* Dr. Hodgson contacted Plaintiff's therapist, Melissa Elle, LCSW. Ms. Elle expressed her diagnostic concerns to Dr. Hodgson as well as her concerns that Plaintiff was in need of further supports in the community. *Id.* at 744.

During Dr. Hodgson's interview of Plaintiff, she observed that he had moderately poor hygiene and interacted in a manner typical of someone much younger, although at times he demonstrated strong insight and a mature perspective. *Id.* His anxiety was "extremely high" at the beginning of the session, with visible trembling and performance concerns. *Id.* He demonstrated hypervigilance and an exaggerated startle reflex. *Id.* He persisted in describing his past history of abuse, though it was emotional and difficult to discuss. *Id.* Dr. Hodgson noted that Plaintiff's sense of personal responsibility was limited and that he understands gambling was a significant problem for him but it was also his main source of pleasure. *Id.*

Dr. Hodgson administered the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV)—"a measure of cognitive functioning." *Id.* at 744. Results indicated that Plaintiff's processing speed was extremely slow but his General Index Ability placed him in the average range of verbal and nonverbal problem-solving skills (without the impact of his processing speed). *Id.* at 744-45. He scored in the low-average range (23rd percentile) on verbal comprehension tasks and in the average range on working memory, "suggesting that he is able to recall what he has heard and perform mental operations on what he has stored in [his] short-term memory." *Id.* at 745. Dr. Hodgson noted that Plaintiff's processing-speed score indicated an individual who "typically struggled with reading and writing,

working slowly and effortfully, which can interfere with both comprehension and writing quality, which is consistent with [Plaintiff's] reported history of learning disorder." *Id*.

Plaintiff's roommate completed a "measure of adaptive or real-world functioning." *Id*. The roommate reported that Plaintiff "is functioning with considerable impairments in his practical skills. Plaintiff fell in the second percentile, "which is far below the level predicted by his skills in cognitive assessment." *Id*. Dr. Hodgson reported, "This degree of adaptive deficits is found in individuals with development disabilities, as well as adults who, as a result of psychological or other symptoms, function best with a high degree of environmental structure." *Id*.

Additional testing resulted in no indication that Plaintiff had an autism spectrum disorder. *Id.* at 746. Dr. Hodgson stated that previous diagnoses of anxiety disorder and post-traumatic stress disorder seem insufficient to describe Plaintiff's "marginal functioning." *Id*. at 747. She reported that Plaintiff's other potential diagnoses of borderline personality disorder and alcohol abuse were beyond the scope of her assessment but warranted further investigation. *Id.* She recommended continued therapeutic management, psychiatry, and frequent regular therapy, including a group support component, and, as already noted, concluded that his options were job coaching/supported employment or social security disability insurance. *Id.*

In November 20122, psychologist Warren Leib, Ph.D. reviewed Plaintiff's records at the request of the state agency. He concluded that Plaintiff had mild restriction in his activities of daily living; moderate difficulties in maintaining social functioning and in

maintaining concentration, persistence, and pace; and no repeated episodes of decompensation. *Id*. at 143.

In May 2012, psychologist Douglas Rau, Ph.D. reviewed Plaintiff's records at the request of the state agency. He believed that he was moderately limited in several areas, especially his ability to interact appropriately with others, respond appropriately to supervisors, and adapt to changes in the workplace. *Id*. at 168-70. He thought that Plaintiff was unable to remember detailed instructions but can remember and understand simple instructions, and could carry out very short and simple instructions. *Id*. at 168. Dr. Rau also wrote, "[Plaintiff] has pathological personality characteristics, intermittent anger and marginal hygiene but can relate adequately for the purpose of completing simple tasks in a low demand setting. Best suited for work activities that require minimal collaboration with others and did not require contact with the general public." *Id*. at 169.

In March, 2012, Plaintiff's mental-health therapist, Ms. Elle, completed a medical-source statement, noting that she had treated Plaintiff since October 2008 and that the frequency of treatment had varied over the years. She noted that at that time, he was engaged in monthly individual therapy and was working toward weekly group therapy. *Id*. at 674-76. Ms. Elle listed Plaintiff's diagnoses as depressive disorder, pedophilia, pathological gambling, borderline personality traits, R/O (rule out) substance abuse, R/O obsessive-compulsive disorder, R/O post-traumatic stress disorder. *Id*. at 674. Ms. Elle noted that Plaintiff's alcohol and opiate use (pain pills) was "intermittent. *Id.* at 674. Her brief outline of Plaintiff's psychiatric history reported that he was sexually abused as a child; had chronic suicidal ideations; had been hospitalized for suicidal ideations and

attempts, due to his fear of harming a child; and had a history of gambling addiction and related homelessness. *Id*. Ms. Elle pointed out Plaintiff's pattern of showering a few times a week, leaving clothes on the floor for a couple years, leaving dog urine on the floor for "some time," eating one meal a day, and has a history of lacking good judgment and ability to cope on the job, resulting in a history of quitting impulsively multiple times. *Id*. at 675. She also noted that he had been handling frustration better, but had not been in a work environment to be triggered. *Id*.

With respect to Plaintiff's activities of daily living, Ms. Elle opined that he had a serious problem, on a weekly basis, taking care of personal hygiene; a serious problem, on a daily basis, tending to his physical needs; a very serious problem, on a weekly basis, using good judgment regarding safety and dangerous circumstances; and obvious problems, on a weekly basis, using appropriate coping skills to meet ordinary demands of a work environment and handling frustration appropriately. *Id*. With regard to social interactions, she opined that he had serious problems, on a weekly basis, interacting appropriately with others in a work environment and respecting/responding appropriately to others in authority. *Id*. at 676. She opined that he had obvious problems, on a weekly basis, asking questions or asking for assistance, and getting along with others without distracting them or exhibiting behavioral extremes. *Id.* In support of these opined limitations, she referenced his history of walking out when angry at a boss or not showing up to work, plus suicidal ideations due to someone not speaking to him or being triggered of a sexual thought when seeing a child at work. *Id.* He was overly anxious about pleasing people and struggled with assertiveness. *Id.*

With regard to Plaintiff's task performance, Ms. Elle found that he had a very serious problem, on a daily basis, performing work activity on a sustained basis (8 hours per day, 5 days per week). *Id.* She believed that he had a serious problem, on a daily basis, with performing basic work activities at a reasonable pace/finishing on time without direction. *Id.* She also opined that he had obvious problems, on a daily basis, carrying out multi-step instructions and focusing long enough to finish simple assigned activities or tasks, and slight problems, on a daily basis, in carrying out single-step instructions or changing from one simple task to another. She described him as having significant hygiene difficulties in terms of not showering regularly and the cleanliness of the home, but noted that he does shower and put on clean clothes for therapy. He was unable to remember three words after 25 minutes, demonstrated some difficulty concentrating when depressed, and appeared to have cognitive limitations, but was alert and oriented and able to list five "t" words. *Id.*

Ms. Elle observed that Plaintiff spoke at a normal rate, but he jumped to different unrelated topics at times, which was attributed to anxiety and ruminating thoughts. *Id*. at 675. He had daily thoughts of gambling and "sexual thoughts of kids every couple weeks. *Id.* His mood was variable related to stressors and he struggled daily with anxiety, and his judgment and insight were limited. *Id.*

In March 2013, another therapist—Brian A. Cardona, LCSW—completed a mental-medical-source statement, noting that he had been seeing Plaintiff weekly for 45-50 minute sessions. *Id*. at 749. He listed diagnosis codes for depressive disorder, not otherwise specified; pedophilia; and compulsive gambling. *Id*. at 749.

Mr. Cardona reported that Plaintiff had ongoing depression, "periodically displays

old type behaviors, ongoing gambling, [and] difficulties tending to ADLs [activities of daily living]." *Id.* Mr. Cardona checked boxes indicating that Plaintiff had no useful ability to make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, or deal with stress of semiskilled and skilled work. *Id.* at 751-52. He opined that Plaintiff was unable to meet competitive standards with regard to his ability to respond appropriately to changes in a routine work setting or set realistic goals or make plans independently of others. *Id.* He opined that Plaintiff was seriously limited in his ability to maintain attention for two-hour segments, maintain regular attendance and be punctual within customary and usually strict tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, deal with normal work stress, understand and remember detailed instructions, and carry out detailed instructions. *Id.*

At one point, the form asked, "[If] stress tolerance is an issue, what demands of work does this patient find stressful?" *Id.* at 753. Mr. Cardona answered, again checking boxes, that Plaintiff finds the following stressful: speed, precision, complexity, deadlines, making decisions, exercising independent judgment, working with other people, dealing with the public, dealing with supervisors, being criticized by supervisors, simply knowing that work is supervised, fear of failure at work, lack of collaboration on the job, and no opportunity for learning new things. *Id.* Mr. Cardona also opined that Plaintiff's impairments or treatment would cause him to be absent from work about one day per month. *Id.*

Mr. Cardona also checked boxes identifying Plaintiff's signs and symptoms as follows: anhedonia; decreased energy; blunt/flat/inappropriate affect; feelings of guilt or worthlessness; impairment in impulse control; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; paranoid thinking or inappropriate suspiciousness; recurrent obsessions or compulsions, which are a source of marked distress; emotional withdrawal or isolation; hyperactivity; emotional lability; flight of ideas; manic syndrome; inflated self-esteem; illogical thinking; easy distractibility; and memory impairment. *Id*. at 750.

Dr. James Gusfa, M.D., subsequently reviewed, revised, and signed the medical source statement originally completed by therapist Mr. Cardona. Dr. Gusfa adopted Mr. Cardona's opinion with regards to Plaintiff's diagnoses and the clinical findings that supported the opinion. *Id*. at 824. Dr. Gusfa agreed with Mr. Cardona's assessments except Dr. Gusfa found more significant limitations in several areas. Dr. Gusfa thought that Plaintiff had no useful ability to deal with normal work stress or to adhere to basic standards of neatness and cleanliness. *Id*. at 824-25. He also believed that Plaintiff was unable to meet competitive standards with regard to his ability to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; understand, remember, and carry out detailed instructions; interact appropriately with the general public; and maintain socially appropriate behavior. *Id*. He also opined that Plaintiff would miss more than four days of work per month. *Id.* at 826.

**IV.    "Disability" and The ALJ's Decision**

Plaintiff's eligibility to receive Disability Insurance Benefit and Supplemental Security hinged on whether he was under a "disability" as defined by social security law. *See* 42 U.S.C. §§ 423(d)(1)(A)-(d)(2)(A), 1381a; *see also Bowen v. City of New York*, 476 U.S. 467, 470 (1986). To determine if he was under such a disability, ALJ Motta evaluated the evidence under the Social Security Administration's 5-step evaluation procedure. 20 C.F.R. §§ 404.1520(a)(4). Moving through step 1, she found at steps 2 and 3 that Plaintiff's impairments—including his severe impairments of "affective (depressive) disorder, anxiety disorder with features of post-traumatic stress disorder and obsessive/compulsive disorder, personality disorder with features of pedophilia…."—did not automatically entitle him to benefits. (Doc. #7, *PageID* #s 51-60).

At step 4, the ALJ found that the most Plaintiff could do despite his impairments— his residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)—was work at any exertional level subject to the following mental-work limitations:

> He is limited to performing jobs that do not involve detailed instructions. He is limited to tasks that involve only simple work-related decisions. The claimant is restricted to performing simple, repetitive tasks involving low stress (i.e., no strict production quotas or fast pace and only routine work with few changes in the work setting). He should have no contact with the public as part of job duties and only occasional contact with co-workers and supervisors. The claimant should not be expected to perform tasks involving teamwork or requiring close (i.e., "over-the-shoulder") supervision.

(Doc. #7, *PageID* #60).

ALJ Motta further found at step 4 that Plaintiff could no longer perform his past work as a busser, a concession-stand worker, or an ice-cream-counter attendant. *Id.* at 64-

65.  However, Plaintiff could, according to ALJ Motta, do a significant number of jobs available in the national economy such as bakery helper, laundry worker, or assembly machine tender.  This led ALJ Motta to her ultimate conclusion that Plaintiff was not under a disability and not entitled to benefits.  *Id*. at 65-66.

## V.      Standards of Review

The present review of ALJ Motta's decision determines whether she applied the correct legal standards and whether substantial evidence supports her findings.  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).  If she failed to apply the correct legal criteria, her decision may be fatally flawed even if the record contains substantial evidence supporting her findings.  *Rabbers*, 582 F.3d at 651; *see Bowen*, 478 F.3d at 746; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).  Substantial evidence supports a finding when "a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance ...."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

## VI.     Discussion

As indicated at the start, Plaintiff contends that the ALJ erred by not crediting the opinions of two examining psychologists, Drs. Magnavito and Hodgson; his treating psychiatrist, Dr. Gusfa; and, his two treating therapists Ms. Elle and Mr. Cardona—each of

whom is a licensed clinical social worker. Plaintiff further argues that the ALJ erred by inadequately weighing the opinions of record-reviewing psychologist Dr. Rau.

The Commissioner maintains that the ALJ complied with the law by providing good reasons for discounting the medical-source opinions she found worthy of less weight.

Socials Security law requires an ALJ to weigh the opinions of a treating psychiatrist or psychologist opinion under the treating physician rule. The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citation omitted); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014); 20 C.F.R. § 404.1527(c)(2). If the treating medical source's opinion is not controlling, the ALJ must continue to weigh those opinions under "a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

ALJs must provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.*

The ALJ placed little weight on the opinions provided by Ms. Elle and Mr. Cardona. The ALJ first recognized that neither treating therapist is considered to be an "acceptable medical source" under Social Security Regulations. This is correct because both Ms. Elle and Mr. Cardona are licensed clinical social workers. *See* 20 C.F.R. §§ 404.1513(a), (d); *see also* Soc. Sec. Rul. 06-3p, 2006 WL 2329939, at *2 (Aug. 9, 2006) ( identifying licensed clinical social workers as "other sources" rather than "acceptable medical sources."). The ALJ next wrote, "Therefore information provided by therapists does not equal in probative value reports from those medical sources shown as being acceptable such as licensed psychologist or psychiatrists." (Doc. #7, *PageID*#55). This is incorrect as a matter of law. "The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the facts in each case. Each case <u>must</u> be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." Soc. Sec. Rul. 06-3p, 2006 WL 2329939, at *5 (emphasis added). The ALJ's general statement—"information provided by therapists does not equal in probative value reports from … [acceptable] medical sources"—ignores this mandatory case-by-case consideration of the probative value non-acceptable medical sources' opinions have or lack. *See id.* Any doubt about this, and there is none, is eliminated by the further explanation in Ruling 06-3p:

> The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because…, "acceptable medical sources" "are the most qualified health care professionals." However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of

a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) ….

2006 WL 2329939, at *5.

Yet, the ALJ's error on this point of law was harmless because she evaluated the opinions provided by Ms. Elle and Mr. Cardona as Ruling 06-2p otherwise required and adequately explained her reasons for placing little weight on their opinions. *See Marijanovic v. Comm'r of Soc. Sec.*, No. 17-1283, 2017 WL 8231367, at *1 (6th Cir. 2017) ("the ALJ should explain the weight given to the opinion [of a social worker] such that the claimant or a subsequent reviewer is able to follow the ALJ's reasoning." (citing Soc. Sec. Rul. 06-3p, 2006 WL 2329939, at *6; *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007)).

The ALJ also found their opinions "very pessimistic assessments of the claimant's functional capabilities." (Doc. #7, *PageID* #55). The ALJ also found that they "greatly overstate the degree of functional limitation experienced by the claimant." *Id*. at 55. For example, Ms. Elle opined that Plaintiff would have "an obvious problem" getting along with others, *id*. at 676, and Mr. Cardona's believed that Plaintiff would be "unable to meet competitive standards" making plans independently of others, *id*. at 752, yet the ALJ noted that Plaintiff attended meetings of Gamblers Anonymous and PFLAG (Parents and Friends of Lesbians and Gays), went to the casino regularly to play slots or to watch others gamble, went shopping, and ate out with friends, *id*. at 55. It was reasonable for the ALJ to

recognize these activities as inconsistent with the therapists' opinions about Plaintiff's social limitations. Ms. Elle opined, moreover, that Plaintiff would have "an obvious problem" focusing long enough to finish activities or tasks, *id*. at 676, and Mr. Cardona wrote that Plaintiff was "seriously limited" in maintaining attention for a 2-hour period, *id*. at 751. Yet, these opinions were not consistent with the fact that Plaintiff went to meetings and to the movies, both of which would require more focus and concentration than Plaintiff had, according these therapists. The ALJ also reasonably noted that their assessments were inconsistent with Plaintiff's abilities to have a great relationship with his roommate, eat out with friends, and use a computer. *See* 20 C.F.R. §404.1527(c)(4) ("Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"). And it was similarly reasonable for the ALJ to find, "while the claimant argues that he lacks the mental capacity to work, he demonstrates sufficient mental capacity to engage in wide-ranging activities in which he is interested." *Id*. at 56.

There were additional valid reasons to give less weight to Ms. Elle's and Mr. Cardona's assessments. For example, Ms. Elle wrote that Plaintiff had hygiene difficulties, yet he would always shower and wear clean clothing for therapy. *Id*. at 674. This internal inconsistency in her assessments was also a valid reason for giving it less weight.

The ALJ also properly placed little weight on Dr. Gusfa's opinions. Dr. Gusfa merely signed the assessment form Mr. Cardona completed with only 8 differences in the check-marked limitations. More significantly, Dr. Gusfa provided no supporting explanation for either his agreement with Mr. Cardona or the 8 differences he identified. The ALJ can properly discount even a treating physician's opinion when it contains no

meaningful explanation.  *See* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinions, the more weight we will give that opinion.").  Moreover, Dr. Gusfa did not comment on how often he saw Plaintiff or when Plaintiff started seeing him.  The ALJ also accurately recognized that Plaintiff worked part time in the past, and that "that job ended when the theater closed—not because of any functional limitations associated with either a mental or physical impairment."  *Id*.

Dr. Gusfa's treatment notes are inconsistent with this assessment. *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 530 (6th Cir. 1997) ("[A]ny claim by Dr. Austin that Walters suffered from impairments of disabling severity would not be supported by detailed, clinical, diagnostic evidence in his reports.").  For example, at an appointment on June 15, 2013, which was only a few months after this assessment, Dr. Gusfa noted that Plaintiff only had mild depression that was "trending better," with good sleep, pretty good energy and appetite, and unremarkable speech.  (Doc. #7, *PageID* #994).  Plaintiff's thoughts tracked with the conversation, he denied homicidal or suicidal ideation, and his occasional sexual thoughts towards children had not increased and he had no plan or intent to act on them.  *Id*. Dr. Gusfa further noted that Plaintiff was responding well to treatment, and he reduced Plaintiff's dosage of Effexor to the lowest effective dosage.  *Id*. at 995.  Such an unremarkable exam only a few months after Dr. Gusfa's assessment undermines his dire assessment.

The ALJ also reasonably recognized that Mr. Cardona and Dr. Gusfa made speculative assertions about work absences that were unsupported by the record and worthy of little weight.  *Id*. at 56.  As the ALJ noted, Mr. Cardona checked a box stating Plaintiff

would be absent from work 1 day per month, *id*. at 753, and Dr. Gusfa amended this to more than 4 missed days of work per month, *id*. at 826. The ALJ reasonably explained that she viewed such statements "with considerable skepticism" because ALJs are "not bound by conclusory statements of doctors, particularly when they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).

Here, it is also unclear why there was such a large inconsistency between Mr. Cardona's view that Plaintiff would be absent from work 1 day per month and Dr. Gusfa's opinion that he would miss 4 or more days of work per month. There is nothing that explains such vastly different opinions, especially when they both treated Plaintiff. This discrepancy tends to undermine both Mr. Cardona's and Dr. Gusfa's opinions.

The ALJ also properly gave little weight to Dr. Magnavito's June 2009 Million Clinical Multiaxial Inventory-III (MCMI-III) test and interpretive report. First, Dr. Magnavito administered the MCMI-III test but did not appear to treat Plaintiff. Thus, he is not considered a treating physician and his assessment is not entitled to controlling weight. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) ( "Dr. Ruff examined Mr. Barker on only one occasion, and the rationale of the treating physician doctrine simply does not apply …."). Second, the ALJ properly explained that this test was given in June 2009, which was five months before November 2009, which was the earliest date for a potential finding of disability. (Doc. #7, *PageID* #s 48, 56). Thus, this testing was less probative of Plaintiff's actual mental health during the relevant period being adjudicated by the ALJ.

More importantly, Dr. Magnavito's narrative summary was generated mainly from Plaintiff's responses on the MCMI-III test. *See id*. at 734-42. It was not based on a

comprehensive interview, so it contains less probative value than the type of consultative examination that the agency often sends claimants too. Moreover, "MCMI-III reports are normed on patients who were in the early phases of assessment or psychotherapy for emotional discomfort or social difficulties," rather than for people who have subsequently received significant treatment through medication, as well as individual and group therapy. *Id*. at 735. It therefore suggests, in general, an individual who would have a more severe impairment and disorder, since they would not yet have received significant treatment. Moreover, as the ALJ reasonably noted, even this profile was of a person with "moderate level of pathology" who "is usually able to function on a satisfactory basis" with "difficulties [that] can be managed with either brief or extended therapeutic methods." (Doc. #7, *PageID* #s 56-57, 737, 741. *See Eddy v. Comm'r of Soc. Sec,* 506 F. App'x 508, 509 (6th Cir. 2012) (ALJ properly considered that treatment had stabilized or improved a claimant's condition).

Plaintiff argues that the ALJ did not give proper weight to consultative examiner Dr. Hodgson. But, most of Dr. Hodgson's report contains no opinion about Plaintiff's functional limitations. The examination resulted from Plaintiff's roommate, Stephen Bickford, bringing him for evaluation in December 2011. Mr. Bickford told Dr. Hodgson that he was concerned Plaintiff had an "intellectual disability or autism spectrum disorder." (Doc. #7, *PageID* #743). However, Dr. Hodgeman's testing "yielded results indicative of 'average range' intellectual functioning and his 'presentation is not characteristic of any autism spectrum disorder.'" *Id*. at 747. Thus, Mr. Bickford's impressions of Plaintiff's impairments were inaccurate. Moreover, as the ALJ reasonably

noted that Mr. Bickford's "objectivity is questionable at best based on secondary gain factors." *Id*. at 53. Mr. Bickford stated he financially supported Plaintiff, he would therefore stand to gain if disability benefits were granted. *Cf. Brown v. Comm'r of Soc. Sec.*, 1 F. App'x 445, 452 (6th Cir. 2001) ("Therefore, it is within the Administrative Law Judge's jurisdiction to consider other income sources [workers' compensation] and secondary gain in determining credibility."). And, despite the length of her report, Dr. Hodgson did not actually opine that Plaintiff had any functional work limitations. Her narrative generally addressed Plaintiff's impairments rather than presenting her opinions about specific restrictions Plaintiff had. While Dr. Hodgson did conclude that Plaintiff would be a candidate for job coaching, as the ALJ explained, "she did not rule out the possibility that the claimant could work in competitive employment." (Doc. #7, *PageID* #s 53, 61). Indeed, simply stating that he may benefit from such services does not mean that he required them. As the ALJ properly explained, Dr. Hodgson's recommendation of a job coach does not imply the need for sheltered work, and instead the ALJ properly included "routine work with few changes in the work setting" to account for any deficits in adaptation. *Id*. at 60-61. For these reasons, the ALJ properly considered Dr. Hodgson's opinion, explained why she discounted it, and reasonably offered work restrictions to account for any deficits in adaptation.

Plaintiff contends that the ALJ erred by failing to consider the extent to which the record-reviewing psychologists, Drs. Rau and Leib, were familiar with the evidence in Plaintiff's case record. Plaintiff further contends that the ALJ provided an inadequate rationale for crediting these psychologists' opinions.

The ALJ did not err by placing great weight on the opinions of Drs. Rau and Leib. These psychologists were well qualified by reason of training and experience in reviewing an objective record and formulating an opinion as to limitations. Indeed, the ALJ properly relied upon these doctors when assessing Plaintiff's residual functional capacity because they are experts in the field of disability evaluation. *See* 20 C.F.R. § 404.1527(e)(2)(i); *see also* Soc. Sec. Rul. 96-6p, 1996 WL 374180, *2 (July 2, 1996) ("Program physicians, psychologists, and other medical specialists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation."); *Blakely v. Comm'r of Soc. Sec.*, 581 F. 3d 399, 409 (6th Cir. 2009) ("Certainly, the ALJ's decision to accord greater weight to state agency physicians over [Plaintiff]'s treating sources was not, by itself, reversible error."). The ALJ explained, moreover, that despite giving great weight to the assessments provided by Dr. Rau and Dr. Leib, she did not adopt the exact limitation that Plaintiff "will require support and direction establishing goals." *Id*. at 146, 170. Rather, she ultimately found that Plaintiff required slightly different limitations than those recommended by these psychologists after she heard and considered Plaintiff's testimony and that later-supplied medical evidence. *See McGrew v. Comm'r of Soc. Sec*., 343 F. App'x 26, 32 (6th Cir. 2009) ("It is clear from the ALJ's decision, however, that he considered the medical examinations that occurred after [the state agency physician's] assessment . . . and took into account any relevant changes in McGrew's condition."). Specifically, the ALJ explained that this recommendation for support did not imply the need for sheltered work, and instead the ALJ included a limitation to "routine work with few changes in the work setting" to reasonably account for any deficits in adaptation. *Id*. at 60- 61. The ALJ noted

that Plaintiff may benefit from this type of job assistance and that it may "be helpful, it is not a basis for finding an individual disabled or more restricted than in the residual functional capacity." *Id*. at 61. The ALJ specifically explained that Plaintiff is able to "demonstrate[] sufficient mental acuity in his activities to indicate that he would be able to perform essentially unskilled simple, repetitive work tasks involving no detailed instructions and low-stress duties." *Id*. And, again, in order to account for issues in adapting to change, the ALJ reasonably restricted Plaintiff to work with "no strict production quotas or fast pace and only routine work with few changes in the work setting." *Id*. at 60. In doing so, the ALJ adequately accounted for the inevitable gap in time between the time Drs. Rau and Leib reviewed the record and the date of the ALJ's decision. *See also Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009) ("[t]here will always be a gap between the time the agency expert's review of the record and . . . the time the hearing decision is issued. Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand.").

Accordingly, for the above reasons, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE ORDERED THAT:

1.   The ALJ non-disability decision on December 2, 2105 is affirmed;

2.   Plaintiff's Request for Oral Argument is denied as moot; and

3.   The case is terminated on the Court's docket.


March 29, 2018                          *s/Sharon L. Ovington*
                                         Sharon L. Ovington
                                         United States Magistrate Judge